[Cite as *State v. Smith*, 193 Ohio App.3d 201, 2011-Ohio-997.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
### SENECA COUNTY

THE STATE OF OHIO,

     APPELLEE,                                   CASE NO.  13-10-24

     v.

SMITH,                                        **O P I N I O N**

     APPELLANT.

Appeal from Seneca County Common Pleas Court

Trial Court No. 09 CR 0278

Judgment Affirmed

Date of Decision:   March 7, 2011

APPEARANCES:

     Derek W. DeVine and Rhonda L. Best, for appellee.

     James S. Nordholt Jr., for appellant.

PRESTON, Judge.

{¶ 1} Defendant-appellant, Marquis Smith, appeals the judgment of conviction and sentence entered against him by the Seneca County Court of Common Pleas following a jury trial in which Smith was found guilty of one count of trafficking in crack cocaine. For the reasons that follow, we affirm.

{¶ 2} On December 16, 2009, the Seneca County Grand Jury returned an indictment against Smith charging him with the following counts: count one, trafficking in cocaine, with a specification that the offense was committed in the vicinity of a school in violation of R.C. 2925.03(A)(1) and (C)(4)(b), a felony of the fourth degree; and count two, trafficking in crack cocaine in violation of R.C. 2925.03(A)(1) and (C)(4)(c), a felony of the fourth degree. On January 7, 2010, Smith was arraigned and entered pleas of not guilty to both counts in the indictment.

{¶ 3} A jury trial was held on May 10 and 11, 2010. After the presentation of the evidence, the jury returned verdicts of not guilty as to count one, trafficking in cocaine, with a specification, and guilty as to count two, trafficking in crack cocaine.

{¶ 4} A sentencing hearing was held on May 18, 2010, and Smith was sentenced to 17 months in prison.

{¶ 5} Smith now appeals and raises the following two assignments of error.

## ASSIGNMENT OF ERROR NO. I

The verdict of guilty rendered by the jury was against the manifest weight of the evidence.

{¶ 6} In his first assignment of error, Smith claims that his conviction was against the manifest weight of the evidence.

{¶ 7} An appellate court's function when reviewing the weight of the evidence is to determine whether the greater amount of credible evidence supports the verdict. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541. In reviewing whether the trial court's judgment was against the weight of the evidence, the appellate court sits as a "13th juror" and examines the conflicting testimony. Id. In doing so, this court must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the fact-finder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Andrews*, 3d Dist. No. 1-05-70, 2006-Ohio-3764, ¶ 30, citing *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717; *Thompkins* at 387.

{¶ 8} Here, Smith was found guilty on one count of trafficking in drugs in violation of R.C. 2925.03(A)(1), which states that "[n]o person shall knowingly * * * (1) [s]ell or offer to sell a controlled substance." However, on appeal, Smith disputes only the evidence identifying him as the person who had sold the drugs to the confidential informant.

{¶ 9} The record indicates that on January 8, 2009, and January 11, 2009, the Seneca County Drug Task Force conducted controlled-buy operations at 26 Minerva Street and 233 Franklin Street, Tiffin, Seneca County, Ohio, after having been informed by a confidential informant that he would be able to purchase crack cocaine from Smith.

{¶ 10} Detective Charles W. Boyer, with the city of Tiffin, testified that he had been the officer in charge of the two operations, since it had been his confidential informant that had originally come to him with information that he could purchase crack cocaine from Smith. Boyer stated that he, along with two other officers, conducted two controlled buys: the first one on January 8, 2009, at 26 Minerva Street; and the second one on January 11, 2009, at 233 Franklin Street. On January 11, 2009, Boyer said that O'Leary, his confidential informant, contacted him and informed him that he would have the opportunity to buy drugs from someone known as Parkay or PK at 233 Franklin Street in Tiffin. Boyer said that they knew Smith, was known as PK or Parkay and that at the time Smith was

residing at 233 Franklin Street, the same residence as the target location for the second controlled-buy operation.

{¶ 11} That night, Boyer, along with two other officers, met O'Leary at a predetermined location, and conducted their standard pre-operational procedure, which included searching O'Leary for weapons or other contraband, placing an audio recording device on O'Leary, and giving O'Leary covert-issued funds of $150 to be used for purchasing the drugs. Boyer said that his particular responsibility during this second controlled-buy operation was visual surveillance, while the other two officers were responsible for the audio surveillance. The two officers dropped off O'Leary close to the target location and O'Leary walked up to the residence at 233 Franklin Street, while Boyer hid next to a garage in a nearby alley. Because O'Leary had arrived at the residence prior to Boyer's having set up the camera in the alley, Boyer said that he was only able to videotape O'Leary leaving the back door of Smith's residence. Then Boyer played the videotape to the jury, which he indicated showed O'Leary walking out of the back door of Smith's residence.

{¶ 12} Once O'Leary left the residence at 233 Franklin Street, Boyer said that he met the other two officers and O'Leary at the predetermined location, at which time they bagged and tagged the suspected cocaine as evidence and searched O'Leary for any additional contraband. Detective Boyer testified that

they did not find any other suspected controlled substance on O'Leary during the search.

{¶ 13} On cross-examination, Boyer acknowledged that he did not personally observe Smith sell the drugs to O'Leary, since both the transactions had taken place inside the residences. In addition, Boyer admitted that he did not request any fingerprint testing on the baggies of drugs, but he said that that was because the identity of the seller had never been in question. Boyer explained, "The only time our unit would specifically ask for fingerprints and/or DNA is when the identity of the suspect is in question and we don't know who it is. In this–in this, or in these investigations, we had him positively identified through a photograph array. Plus, we purchased, on the second operation, from his residence so identity wasn't in question to us." Boyer said that based on the audio recordings, O'Leary's identification of Smith through a photograph array, and the observation of O'Leary going into Smith's residence on January 11, 2009, they believed that O'Leary had purchased the suspected cocaine from Smith.

{¶ 14} Next, the confidential informant, Terry O'Leary, testified. O'Leary explained that he had assisted the police by buying drugs from Smith twice in January 2009. He said that he had been paid for both transactions, and in particular had received $75 for the second controlled-buy operation. With respect to the second operation, O'Leary said that prior to going to the house that night, he

had spoken to Smith about buying drugs again from him. O'Leary said that they had discussed the amount of money and drugs, the type of drugs, and the time and place of the transaction, which he said was to occur at 233 Franklin Street. O'Leary testified that before walking to the target location, he had allowed the officers to place an audio transmitter device on him, which had recorded the transaction that night. O'Leary further said that when he arrived at the residence, he and Smith discussed automobiles before they counted out the money and exchanged it for the drugs. Finally, O'Leary stated that after receiving the drugs, he left the residence and walked down the street and then was picked up by the officers and taken back to the predetermined location.

{¶ 15} State's Exhibit 7 was the audio recording from the second operation on January 11, 2009, which was played at trial. After the recording was played, O'Leary identified all of the voices in the recording, and in particular O'Leary identified the person who said, "Just give me two fifties, I'll owe you 30," as Smith. O'Leary explained that at that point on the tape they were exchanging the money for the drugs.

{¶ 16} Overall, on both direct and cross-examination, O'Leary admitted to having a criminal record, which included convictions for receiving stolen property in 2007, failure to comply with the order or signal of a police officer in 2006, and

two obstruction convictions and one theft conviction in 2002. Nevertheless, O'Leary identified Smith as the person who had sold him the drugs.

{¶ 17} Finally, Smith took the stand and testified that he had never sold crack cocaine to O'Leary. Smith admitted that his nickname was Parkay or PK, but he stated that he had received the nickname when he was younger, from his family. Smith explained that he was not even at the Minerva house on January 8, 2009. However, he admitted to living at 233 Franklin Street in January 2009 and being the only male living at the residence at that time. With respect to the controlled-buy transaction that took place on January 11, 2009, Smith explained:

> Honestly, I mean, I'm not going to sit here and try to make up a story or persuade you guys or any kind of way. But he never entered my house, for one. And anybody can walk into that door that he supposedly came out of. That is a back patio porch there. And that door is always open. On the side of that porch is another door to the main house. So anybody can come and go as they please into that door. And it's kind of hard for me to explain him coming out of there because, like I said, I don't know no more than what you guys do. All I know is what he said, the evidence that these people have right now, so–

Based on the above, the jury returned a verdict of guilty as to trafficking in crack cocaine on the night of January 11, 2009.

{¶ 18} On appeal, Smith argues that the only real issue in contention in the case is whether he was the person who sold the drugs to the confidential informant. Smith claims that the only evidence presented identifying him as the

person who had sold the drugs was testimony from the confidential informant, Terry O'Leary. However, Smith claims that O'Leary's testimony was conflicting and suspect. After reviewing the above evidence, we disagree and believe that there was enough evidence presented to the jury that it was reasonable to believe that Smith had been the one who had sold the crack cocaine to O'Leary.

{¶ 19} Here, the confidential informant testified that he had purchased crack cocaine from Smith on January 11, 2009. Boyer testified that the identity of the seller had never been in question—that based on the audio recordings, O'Leary's identification of Smith through a photograph array, and the observation of O'Leary going into Smith's residence on January 11, 2009, they believed that O'Leary had purchased the cocaine from Smith. Moreover, this transaction had taken place at Smith's residence. Smith even admitted that he was the only male living in the residence at the time, and unlike the first controlled-buy operation, Smith could not provide any explanation as to his actions the night of January 11, 2009. In addition, there was an audio recording of the transaction that was played for the jury, along with corroborating testimony and a video that showed a man, who was identified as the confidential informant, leaving Smith's residence the night of January 11, 2009.

{¶ 20} Essentially, Smith's arguments that his conviction was against the manifest weight of the evidence are simply attacks based on the credibility of the

confidential informant. However, the confidential informant's testimony and credibility were matters for the trier of fact to weigh and determine, and the trier of fact was free to accept or reject any and all of the evidence offered by Smith and the state. *Thompkins*, 78 Ohio St.3d at 387. Based on the above evidence, we cannot conclude that the jury clearly lost its way and created a manifest injustice by finding Smith guilty of trafficking crack cocaine.

{¶ 21} Smith additionally claims that the fact that he was found not guilty of one count of trafficking but guilty of the other count of trafficking clearly indicates that the jury lost its way, since the evidence presented on the two operations was identical. As Smith states in his appellate brief, there was "no apparent reason for the jury to disbelieve the testimony of Mr. O'Leary that he bought drugs from the defendant January 8 and yet apparently believe his testimony that he bought drugs [from the defendant] on January 11."

{¶ 22} "Consistency between verdicts on several counts of an indictment is unnecessary where the defendant is convicted on one or some counts and acquitted on others; the conviction generally will be upheld irrespective of its rational incompatibility with the acquittal." *State v. Trewartha*, 165 Ohio App.3d 91, 2005-Ohio-5697, 844 N.E.2d 1218, ¶ 15, citing *State v. Adams* (1978), 53 Ohio St.2d 223, 374 N.E.2d 137, vacated in part on other grounds in *Adams v. Ohio*, 439 U.S. 811, 99 S.Ct. 69, 58 L.Ed.2d 103. Every count of a multiple-count

indictment is considered to be distinct and independent of all the other counts; therefore, inconsistent verdicts on different counts do not justify overturning a verdict of guilt. Id., citing *State v. Hicks* (1989), 43 Ohio St.3d 72, 78, 538 N.E.2d 1030; *State v. Brown* (1984), 12 Ohio St.3d 147, 465 N.E.2d 889, syllabus; *State v. Washington* (1998), 126 Ohio App.3d 264, 276, 710 N.E.2d 307. As the Ohio Supreme Court has stated, "the sanctity of the jury verdict should be preserved and could not be upset by speculation or inquiry into such matters to resolve the inconsistency." *State v. Lovejoy* (1997), 79 Ohio St.3d 440, 444, 683 N.E.2d 1112.

{¶ 23} Thus, the fact that Smith was found guilty of one count of trafficking but not the other count of trafficking cannot be attributed solely to the jury's insecurity, confusion, or doubts as to the adequacy of evidence on the issue of identification. Despite Smith's claims that the evidence presented in regard to the two operations was identical, we find that there were notable differences in the evidence regarding the first controlled-buy operation and the second. First and foremost, the two operations took place on two separate days and occurred at two different places. Second, even though O'Leary testified that it was Smith who had sold him the drugs during the first operation, O'Leary also said that there had been some kind of party going on when he arrived at the house and that there had been at least four or five other people there along with Smith. Furthermore, unlike the

second controlled-buy operation, which had taken place at Smith's residence, there was nothing to directly connect Smith to the residence at 26 Minerva Street. Finally, only with respect to the first controlled-buy operation were there parts of O'Leary's testimony that directly contradicted with Boyer's testimony. Thus, it is clear that there were credibility issues concerning the first controlled-buy operation that were not present in the second controlled-buy operation.

{¶ 24} As illustrated above, there were notable differences in the evidence as to the two controlled-buy operations; however, we are not permitted to speculate about the reason for the inconsistency in considering the validity of a verdict. We find that the fact that Smith was found guilty of one count of trafficking but not the other count of trafficking is not enough in and of itself to undermine the final judgment of the trafficking count of which Smith was convicted by the jury, especially since that conviction, as we stated above, was not against the manifest weight of the evidence.

{¶ 25} Smith's first assignment of error is, therefore, overruled.

## ASSIGNMENT OF ERROR NO. II

The court erred when it responded to a question from the jury with an answer in violation of the principles set forth in *State v. Howard* and compounded that error by failing to review the question and answer with counsel.

{¶ 26} In his second assignment of error, Smith argues that the trial court erred when it responded to a jury question without giving the appropriate supplemental instruction to the jury as required by the Ohio Supreme Court in *State v. Howard* (1989), 42 Ohio St.3d 18, 537 N.E.2d 188 ("*Howard* instruction"). Smith additionally claims that the trial court erred by failing to review the question and answer with counsel prior to responding to the jury's question.

{¶ 27} According to the trial transcripts, the jury went into deliberations at 12:15 p.m. on May 11, 2010, and rendered its verdict at 7:00 p.m. that same day. Between 12:15 p.m. and 7:00 p.m. the jury submitted four questions to the trial court. For the first two questions, the trial court called in counsel and discussed the jury's questions and its proposed answers on the record. With respect to the fourth jury question, the trial court called in counsel again and presented its proposed answer to the parties; however, after discussing the fourth jury question and proposed answer, the trial court informed the parties that the jury had presented a third question to the trial court and that it had dealt with the question without involving counsel. In particular, the trial court stated that the jury had

asked, "What do we do now?" and it informed counsel that it had responded, "Keep deliberating."[1]

{¶ 28} In general, "any communication with the jury by either the judge or court personnel, outside the presence of the defendant or parties to the case, is error and may warrant a new trial." *State v. Cook*, 10th Dist. No. 05AP-515, 2006-Ohio-3443, ¶ 35, citing *State v. Schiebel* (1990), 55 Ohio St.3d 71, 83, 564 N.E.2d 54. "Such private communication outside the presence of the defendant does not, however, create a conclusive presumption of prejudice. * * * The communication must have been of a substantive nature and in some way prejudicial to the party complaining." *Schiebel* at 84. Thus, if the communication is not substantive, then the error is considered harmless. *Cook* at ¶ 35, citing *State v. Allen* (1995), 73 Ohio St.3d 626, 630, 653 N.E.2d 675. In particular, substantive matters have been found to include discussions concerning "'legal issues involved in the case, applicable law, the charge to the jury, or a fact in controversy.'" *Cook* at ¶ 36, quoting *Orenski v. Zaremba Mgt. Co.*, 8th Dist. No. 80402, 2002-Ohio-3101. Nevertheless, even if the communication involves a substantive issue, the defendant still must demonstrate that he was prejudiced by the communication. *Cook*, 2006-Ohio-3443, at ¶ 36, citing *State v. Crumedy*, 8th Dist. No. 84083, 2004-Ohio-6006.

---

[1] We note that neither party disputes the fact that the particular question and answer were given even though the actual jury questions and answers were not included in the record.

{¶ 29} While it may have been error for the trial court to answer the jury's question outside the presence of the parties, we note that Smith failed to object to the trial court's answer to the jury when he was informed of the trial court's actions and failed to request that a *Howard* instruction be given. Therefore, we find that Smith has waived all but plain error. See Crim.R. 52(B). Plain error occurs if but for the error, the outcome of the trial would have been different. *State v. Nicholas* (1993), 66 Ohio St.3d 431, 436, 613 N.E.2d 225. After reviewing the record, we find that while it may have been error to handle the question outside the presence of the parties, the trial court's response was not substantive. The trial court did not address any applicable law in the case, any fact in controversy, nor any legal issue. Therefore, absent a showing of prejudice, the communication is considered harmless error.

{¶ 30} Smith claims that there was clearly prejudice in this case since the jury found him guilty of one count of trafficking but not guilty of the other count of trafficking based on the same exact evidence. However, as we discussed above, there were notable differences in the evidence between the two counts, one of which was the fact that the two counts dealt with two different transactions on two separate and distinct dates and locations. Furthermore, the fact that there are different verdicts on different counts does not justify overturning a verdict of guilt.

**{¶ 31}** In addition, Smith argues that this question implicated the need for a supplemental charge to a deadlocked jury as required under *Howard*. The instruction formulated by the Ohio Supreme Court in *Howard* is to be given to a jury, when after suitable deliberation, a "'determination has been made that the jury is deadlocked in its decision.'" *State v. Gary* (Mar. 30, 2000), 3d Dist. No. 5-99-51, at *5, quoting *State v. Minnis* (Feb. 11, 1992), 10th Dist. No. 91AP-844. A trial court's decision to give a *Howard* instruction is within its discretion and will not be reversed absent an abuse of discretion. *State v. Lightner*, 3d Dist. No. 6-09-02, 2009-Ohio-4443, ¶ 11, citing *State v. Thomas* (Sept. 21, 2001), 2d Dist. No. 2000-CA-43, citing *State v. King* (Mar. 22, 2000), 7th Dist. No. 95 CA 163. Furthermore, this court has previously stated that "[t]here is no bright line rule that may be used to determine when a jury is deadlocked and when the supplemental charge should be read to the jury." *Gary* at *5, citing *Minnis*. See also *Lightner* at ¶ 9-16. However, in this particular case, contrary to Smith's arguments, the jury question did not state that the jury was deadlocked; rather, the question was general and non-descript – far from a declaration that they were deadlocked. Because we are unable to determine from its face the precise nature of the jury's question, we cannot say that the trial court abused its discretion in failing to give the supplemental instruction for deadlocked juries set forth in *Howard*.

**{¶ 32}** Therefore, Smith's second assignment of error is overruled.

**{¶ 33}** Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

Judgment affirmed.

SHAW and WILLAMOWSKI, JJ., concur.